
*1047396352*

CJ-2004-3723
Mai

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

BRENAN COLE and RACHEL COLE,          )
AUSTIN HODGE and HANNAH HODGE,        )
                                      )
          Plaintiffs,                 )
                                      )
v.                                    )     (Related to Case No.
                                      )     CJ-2019-3048)
AMC MILITARY HOUSING, a foreign limited )
Partnership, BALFOUR BEATTY           )     Judge: Andrews
COMMUNITIES, a foreign limited liability company, )
STEAMMART, LLC, an Oklahoma limited liability )
Company, and GREGG PETERSON CONSTRUCTION )
GROUP LLC, an Oklahoma limited liability company, )
                                      )
          Defendants.                 )

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

SEP - 3 2021

RICK WARREN
COURT CLERK
50

CJ 2021-3723

### PETITION

**COME NOW** the Plaintiffs, Brenan ("Brenan") and Rachel Cole, ("Rachel") husband

and wife, and Austin Hodge and Hannah Hodge, husband and wife, (collectively as the

"Plaintiffs") by and through their attorney of record, Caleb M. Salmon, of the Aizenman Law

Group, and for their causes of action against Defendants, AMC West Housing, a foreign limited

partnership ("AMC"), Balfour Beatty Communities, a foreign limited liability company

("Balfour Beatty"), Steammart, LLC, an Oklahoma limited liability company "Steammart"), and

Gregg Peterson Construction Group LLC, an Oklahoma limited liability company ("GP

Construction"), state as follows:

### PARTIES

1.  Brenan Cole is an active duty service member stationed at Tinker Air Force Base in

    Oklahoma City, Oklahoma.  At all times relevant hereto, he was a resident of Oklahoma

    County.

2.  Rachel Cole is Brenan's wife, and she was also a resident of Oklahoma County at all time relevant hereto.

3.  Austin Hodge is an active duty service member stationed at Tinker Air Force Base in Oklahoma City, Oklahoma.  At all times relevant hereto, he was a resident of Oklahoma County.

4.  Hannah Hodge is Austin's wife, and she was also a resident of Oklahoma County at all time relevant hereto.

5.  AMC is a Delaware limited partnership with its principal place of business in Pennsylvania, owns privatized military housing on Tinker Air Force Base and was the landlord for the Plaintiffs.

6.  Balfour Beatty, a Delaware limited liability company with its principal place of business in Pennsylvania, managed privatized military housing on Tinker Air Force Base, including the housing that Plaintiffs rented from AMC.

7.  Steammart, LLC is an Oklahoma limited liability company with its principal place of business in Oklahoma, and performed general-contractor and remediation work on Tinker Air Force Base, including the housing that Coles rented from AMC.

8.  Upon information and belief, Gregg Peterson Construction LLC is an Oklahoma limited liability company with its principal place of business in Oklahoma that performs general-contractor and remediation services on Tinker Air Force Base, including the housing that Coles rented from AMC.

## JURISDICTION AND AUTHORITY

9.   That this action is brought before this Court for the reason that it may exercise jurisdiction on any basis consistent with the Constitution of the State of Oklahoma and the Constitution for the United States 12 O.S. §2004 (F).

10. That pursuant to 12 O.S. §2004(F), this Court has subject jurisdiction over the claims asserted herein.

## FACTS COMMON TO ALL CAUSES OF ACTION

11.  That the foregoing paragraphs are incorporated by reference as if set forth verbatim.

***Balfour Beatty's Fraudulent Work Order Completion Scheme.***

12.  Balfour Beatty took over housing operations at Tinker Air Force Base in 2008.

13.  Balfour Beatty receives substantial financial incentives from the US Government for timely responding to maintenance requests in its housing operations.

14.  In 2013 Balfour Beatty emailed a directive to employees to modify and 'correct' work orders so that they comply with the Response Time of 30 minutes-1 hour.

15.  Robert Whittington, Balfour Beatty's manager at Tinker Air Force Base from 2014 until July 2017, admitted he doctored work-order information in the electronic maintenance logs at the direction of his superiors and pressured staff to close out unfinished work orders, so that late responses would not count against the company.

16.  In 2015, internal work order data shows, Balfour Beatty recorded an incredulous 23 late work orders out of 6,000 jobs.

17.  In 2016 and 2017, there were at least 65 instances in which Balfour Beatty employees backdated repair requests, filed paperwork claiming false exemptions from response-time requirements, or closed out unfinished maintenance requests.

18. In 2016, Balfour Beatty executives cut Tinker Air Force base's maintenance staff from six to five leaving about 132 homes for each worker to cover while Balfour Beatty continued to represent to the Air Force that it was responding promptly to maintenance requests.

19. In the Summer of 2016, Air Force housing officials at Tinker Air Force Base interviewed residents and confirmed that Balfour Beatty was not entering requests when residents called them in.

20. In July of 2016, Tinker Air Force Base housing personnel noticed a hand-written maintenance schedule on the desk of a Balfour Beatty work-order clerk named Tina Brown that differed from the "official" schedule submitted to the US Government to obtain payment.

21. Internal Balfour Beatty documents show the company issued broad instructions to employees to alter the books.

22. In 2016, another internal memo shared via email instructed clerks to place maintenance requests in a red folder if the workload was excessive and could not be scheduled right away.

23. In 2016, Balfour Beatty said the company learned that one employee at Tinker Air Force Base had acted "improperly," but described the incident as isolated and claimed to have worked with the Air Force to strengthen its maintenance system.

24. In mid-2016, Tina Brown was fired and company executives directed Balfour Beatty employees at Tinker Air Force Base to stop keeping a second set of hand-written maintenance logs.

25. The number of late work orders skyrocketed from 8 to 377. Balfour Beatty regional manager Bailey directed employees to make sure the maintenance numbers met the incentive fee goals by massaging the records using "work order exception policy" to keep winning incentive fees.

26. On September 1, 2016, Balfour Beatty manager Robert Whittington sent an email directing two employees to close 119 resident maintenance requests in four hours. "The objective is to get ALL open Work orders closed today!"

27. In the third quarter of 2016, Balfour Beatty again reported stellar figures, saying it completed between 96% and 98% of maintenance calls on time. The company sought 100% of the incentive fees for which it was eligible that quarter, $41,536.

28. In 2017, discrepancies in the maintenance records and allegations of fraud involving Tinker Air Force Base and at least two other company bases were referred to the Air Force Office of Special Investigations and the Federal Bureau of Investigation.

29. In August of 2017, Tinker Air Force Base's housing office provided AFCEC with evidence that Balfour Beatty was claiming fake exceptions, Tinker Air Force Base staffers urged a curtailing of incentive fees.

30. In December of 2017, the warnings continued. In response, AFCEC cut 3.8% of Balfour Beatty's incentive fees for the second and third quarters of 2017.

31. In 2018, Balfour Beatty said it and the Air Force implemented a new process for recording work orders, including the use of exceptions.

32. In 2018, Tinker Air Force Base had about 1,850 late work orders and the records showed that more than 1,100 fell under a time policy exception.

33. In February 2019, Balfour Beatty Communities President Christopher Williams told Congress the company earned $33 million in annual profit on its military housing operations.  The incentive fees alone on those operations were worth about $800 million over the life of the 50-year contracts it holds for 43,000 homes on 55 Air Force, Navy and Army bases across the country.

34. In April of 2019, Balfour Beatty marked a work order from Derek and Jennifer Rouse as finished on time, claiming to have fixed the couple's back door by installing new weather stripping. However, new weather stripping was never installed.

35. On June 18, 2019 Reuters/CBS News reported on Tinker Air Force Base *Military Housing Contractor Ignored Dangerous Filth and Misled Air Force Investigation Shows.*

36. BB misled the Air Force to qualify for $800 million in bonus payments by falsely certifying that it had completed work orders on time when it had not.

37. In December of 2019, in response to the Reuters/CBS story and Department of Justice's Civil Investigative Demand, Balfour Beatty filed an Improvement Action Plan with U.S. Air Force.

38. On or about January 2020, the Air Force Office of Special Investigations and the Environmental Protection Agency's Criminal Investigation Division executed a federal search warrant and raided the Tinker Air Force Base offices of Balfour Beatty Communities seizing computers and other materials for its investigation into Balfour Beatty's fraudulent work order completion scheme.

***Damage to Plaintiffs from Balfour Beatty's Fraudulent Work Order Completion Scheme.***

39. From August 2017 to August 2018, the Coles lived on-base in privatized military housing owned by AMC and managed by Balfour Beatty.

40. No other housing is available on Tinker Air Force base other than housing managed by Balfour Beatty.

41. In mid-2017, the Coles received orders to transfer to Tinker Air Force Base.

42. Enlisted airmen of Plaintiff's rank and Military Occupational Specialty are expected to live on base, and the Coles had no other practical options for housing. Private landlords require a deposit of first and last month's rent plus a deposit, and that was not an option for the Coles.

43. The Coles contacted Balfour Beatty remotely prior to their move and requested a house to be reserved for them on base.

44. On or around July 12, 2017, the Coles received confirmation that their home located at 7113D Lawrence Drive would be available for move in on August 7, 2017.

45. On August 7, 2017, the Coles arrived on Tinker Air Force Base with all their belongings in a moving truck, under the belief that the home was move-in ready because they had not been able to view it prior to their move.

46. While waiting to sign their lease, the Coles went to view their new home. When they arrived at the home, they noticed that the inside was in extreme disrepair and not in a habitable condition. There was mold everywhere, broken siding, mold-stained drawers and cupboards, broken tiles in the shower, holes in exterior doors, and water damage under the sink.

47. Balfour Beatty promised to fix all of the issues with the Cole home.

48. The uninhabitable condition of their new home caused the Coles to stay in base lodging for the next three days, while employees at Balfour Beatty remediated the inside of the home.

49. Throughout the time the Coles lived in Tinker housing, they had numerous ongoing maintenance issues that were neglected, including ongoing issues with the presence of mold, water leaks, bad seals in their shower, water damage, holes in the exterior doors, and broken siding.

50. In or around August of 2017, the Coles began to notice water leaking into the interior of their home during and after heavy rains. The leaks expanded over time and were most prevalent along the exterior wall of the home that ran from the living room to the HVAC closet.

51. On or around August 30, 2017, the Coles sent Balfour Beatty a letter, requesting that repairs to remedy the water leaks be completed within two weeks.

52. Despite the Coles' reasonable request, Balfour Beatty refused to fix the water leaks. Balfour Beatty's blatant refusal resulted in the Coles' being forced to live in a home with numerous water leaks for the length of their stay on Tinker Air Force Base.

53. On September 5, 2017, the shower located upstairs in the Coles' house continued to leak, causing water stains to appear on the ceiling in the Coles' kitchen, just below the shower. A closer inspection of the water leaks on the ceiling of the kitchen revealed old repair efforts on the ceiling, indicating there had been previous leaks in the same spot.

54. Balfour Beatty sent a staff member to patch the leak coming from the Coles' kitchen ceiling; however, Balfour Beatty took no steps to properly remediate the building materials in the ceiling that had become saturated from the water leaks.

55. In or around August of 2017, the Coles noticed the presence of mold in and around their shower. The Coles contacted Balfour Beatty and requested that the entire shower be replaced because of the mold that had been present since they moved in.

56. Rather than replacing the Coles' shower, Balfour Beatty hired Gregg Peterson Construction Group LLC and Steammart LLC to remediate the existing shower. They did not remediate the mold, but rather grouted over the mold, without fixing the underlying issues that caused the mold to accumulate.

57. In or around August of 2017, the Coles noticed that water was leaking into the inner wall cavity from behind the handles in their shower through gaping holes, where pieces of tiles were missing around the handles. This water leak allowed water to accumulate behind the walls and saturate the wall cavity.

58. The Coles reported the shower problems to Balfour Beatty, and while waiting for them to repair the tile around the shower handles, the Coles observed mold inside the wall cavity.

59. The Coles told Balfour Beatty that they believed the continuous water leak in the shower had caused mold to grow behind the shower wall. However, instead of removing the wall and properly remediating the mold, Balfour Beatty simply replaced the missing tile and concealed the mold.

60. The Coles eventually found mold present throughout their home, including in the upstairs bathroom, in the downstairs kitchen cupboards, in the HVAC closet, and in the air vents.

61. In or around September of 2017, Rachel Cole began having severe bouts of anxiety and depression.

62. In or around August of 2018, Rachel Cole's anxiety and depression became so severe that she began having suicidal ideations. The worsening of Rachel Cole's depression and anxiety was due to the increased stress she was under, caused by Balfour Beatty's failure to properly respond to the Coles' housing issues.

63. Rachel Cole was prescribed medication for her anxiety and depression caused by Balfour Beatty's conduct.

64. In or around August of 2018, the Coles realized that Balfour Beatty was not going to properly remediate the water and mold issues present in their home, causing the Coles to send in their 30-day notice to vacate.

65. Prior to moving out, Rachel Cole spent countless hours cleaning the home to ensure that the Coles did not incur additional charges from Balfour Beatty upon move out.

66. On August 30, 2019, the Coles had a final walk through of their home with Kerry Martinez from Balfour Beatty. Ms. Martinez represented to the Coles that the home was in good condition and that there were only minor repairs for which the Coles would be responsible.

67. Ms. Martinez further represented to Brenan Cole that they would be charged $800.00 for the repairs, which included charges for cleaning, carpet cleaning, new blinds, and new light bulbs.

68. The Coles' final invoice from Balfour Beatty was $3,887.25 and included charges for full carpet replacement, full home repainting, satellite dish removal, and haul-off charges.

69. The Coles later discovered that, although they were charged for carpet replacement and a full home painting, these tasks were never performed.

70. The Coles disputed the charges levied by Balfour Beatty and sent a letter clearly articulating the basis of their dispute.

71. Despite direct knowledge and being placed on notice, in writing, of the disputed move-out charges, Balfour Beatty reported the Coles to a collections agency.

72. Balfour Beatty threatened that Brenan Cole could lose his security clearance if they did not pay the debt immediately and pressured the Coles to take out high interest loans to pay it off.

73. Balfour Beatty's act of submitting the Coles' disputed invoice to collections was reported to all major credit agencies and damaged the Coles' credit.

74. Due to the financial hardship caused by Balfour Beatty, the Coles did not have sufficient financial resources or credit to rent or purchase a home off base.

75. Instead, the Coles were forced to incur high-interest personal loans to purchase a small motorhome, where they now live with their three children.

**Hodges**

76. Throughout 2018 and 2019, Plaintiffs reported various leaks to Defendants who came and performed fixes that seemed to solve the issues.

77. In 2018, Defendants performed a remediation of the HVAC unit and did not tell the Hodges that they discovered mold in the unit.

78. As the months went by, the Hodges grew suspicious that the constant leaks were causing mold growth in the walls and HVAC unit.

79. On September 4, 2019, they ordered a mold and moisture inspection. When they got the results, they discovered that there had been extensive dangerous mold levels throughout their house.

80.  They quickly moved out, terminated their lease and found somewhere else to live. Defendants refused to refund their BAH rent money and they lost most of their textile belongings as well as some other furniture.

81.  Plaintiffs suffered hardship, emotional distress, and loss of property from Defendants' conduct.

### FIRST CLAIM FOR RELIEF
**(Negligence, Gross Negligence and Recklessness)**

82. That the foregoing paragraphs are incorporated by reference as if set forth verbatim.

83. Defendants owed Plaintiffs a duty established by common law to make the home "reasonably safe" for habitation. *Miller v David Grace Inc.* 2009 OK 49.

84. Defendants owed Plaintiffs a duty established by common law to maintain their dwelling to prevent the loss of personal property *independent* of the Landlord-Tenant Act. *Stone v. Linden Real Estate, Inc.* 2009 OK CIV APP 47.

85. That Defendants breached this duty as outlined above.

86. Defendants' constructive eviction of Plaintiffs by harassment and uninhabitable living conditions caused Plaintiffs' injuries.

87. These breaches were the proximate cause of Plaintiffs' personal injuries and property damages.

**WHEREFORE,** premises considered, Plaintiffs pray this Court grant them relief in the form of judgment against Defendants for their negligent, grossly negligent, and reckless conduct for actual and compensatory damages, punitive damages, attorney's fees, costs, interest and any such further relief as this Court deems just and equitable.

## SECOND CLAIM FOR RELIEF
### (Violation of the Oklahoma Consumer Protection Act)

88. That the foregoing paragraphs are incorporated by reference as if set forth verbatim.

89. That Defendants committed unfair and deceptive trade practices which offended public policy and was immoral, unethical, oppressive, unscrupulous and/or substantially injurious to customers pursuant to 15 Okla. St. §752-753 as follows:

    a. Failing to disclose and remediate the mold from Plaintiffs' homes despite the knowledge and ability to do so;

    b. Failing to remediate the construction materials damaged by water and mold;

    c. Failing to repair other conditions in Plaintiffs' homes despite the financial ability to do so;

    d. Failing to adequately repair the shower in Plaintiffs' homes despite the financial ability to do so;

    e. Failing to provide materials to repair or maintain Plaintiffs' home despite the financial ability to do so;

90. That Plaintiff suffered personal injuries, damaged property, stolen property, and the loss of use of property.

**WHEREFORE**, premises considered, Plaintiffs pray this Court grant relief in the form of judgment against Defendants, for actual and compensatory damages arising out of Defendants' violations of the Oklahoma Consumer Protection Act pursuant to 15. Okla. St. § 761.1, assess damages for an unconscionable practice in the amount of $2000 pursuant to 15. Okla. St. § 761.1B, award attorney's fees and costs, accruing interest and any further relief this Court deems equitable and just.

### THIRD CLAIM FOR RELIEF
**(Declaratory Judgment)**

91. That the foregoing paragraphs are incorporated by reference as if set forth verbatim.

92. That Defendants' actions constituted a material breach of the lease agreement which justify any non-performance of Plaintiffs.

WHEREFORE, premises considered, Plaintiffs pray this Court grant them relief in the form of a declaration that Plaintiffs owe no money to Defendants, attorney's fees, costs, interest and any such further relief as this Court deems just and equitable.

### FOURTH CLAIM FOR RELIEF
**(Constructive Fraud and Deceit)**

93. That the foregoing paragraphs are incorporated by reference as if set forth verbatim.

94. That Defendants had a duty to disclose certain facts to Plaintiffs without which Plaintiffs would not have entered into the transaction. Defendants failed to disclose the following facts at the outset of the transaction and during the Plaintiffs' tenancy:

   a. That the homes were notorious for developing leaks.

   b. The Hodges' home contained faulty PEX plumbing that continuously leaked behind the walls.

   c. That Plaintiffs' homes had a history of mold.

   d. That Defendants performed repairs when they had not.

95. That the Defendants intended that Plaintiffs would not discover the foregoing information. Had the Plaintiffs discovered the foregoing information, they would not have entered into the transaction or continued to reside in the home.

96. That Plaintiffs' damages are a direct result of Defendants' failure to disclose material information.

**WHEREFORE**, premises considered, Plaintiffs pray this Court grant relief in the form of judgment against Defendants, for actual and compensatory damages, punitive damages, award attorney fees and costs, accruing interest and any further relief this Court deems equitable and just.

**FIFTH CLAIM FOR RELIEF**
**(Violation of the Oklahoma Residential Landlord Tenant Act 41 Okla. St. §101 et seq.)**

97. That the foregoing paragraphs are incorporated by reference as if set forth verbatim.

98. That Defendants' actions violated Plaintiffs' rights under the Oklahoma Residential Landlord Tenant Act by failing to put Plaintiffs in quiet possession of the leased homes.

99. That Defendants' actions violated Plaintiffs' rights under the Oklahoma Residential Landlord Tenant Act by putting Plaintiffs in uninhabitable homes.

**WHEREFORE,** premises considered, Plaintiffs pray this Court grant all relief available under the Oklahoma Residential Landlord Tenant Act, attorney's fees, costs, interest and any such further relief as this Court deems just and equitable.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty)**

100. That the foregoing paragraphs are incorporated by reference as if set forth verbatim.

101. That Defendants had a fiduciary duty to Plaintiffs to provide habitable housing by virtue of their complete control of Tinker Air Force Base's on-base housing. Plaintiffs had no other on-base housing options other than the housing provided by the Defendants.

102. Defendants further had a fiduciary duty to Plaintiffs because they received an assignment of the Plaintiffs' Basic Allowance for Housing as rent, which Plaintiffs did not have power to withhold from Defendants as a condition of performing maintenance. This in turn deprived Plaintiffs of the typical leverage tenants can exert over a landlord to maintain a property and prevented them from holding back the next month's rent to move

to another place. This assignment further disincentivized Defendants from maintaining the properties.

103.     Defendants breached their fiduciary duty to Plaintiffs as follows:

    a.  Failing to remediate the mold from Plaintiffs' homes despite the knowledge and ability to do so;

    b.  Failing to remediate the construction materials damaged by water and mold;

    c.  Failing to repair other conditions in Plaintiffs' homes despite the financial ability to do so;

    d.  Failing to adequately repair the shower in Plaintiffs' homes despite the financial ability to do so;

    e.  Failing to provide materials to repair or maintain Plaintiffs' home despite the financial ability to do so;

104.     The Plaintiffs' damages are a direct result of Defendants' breach of fiduciary duty.

**WHEREFORE**, premises considered, Plaintiffs pray this Court grant relief in the form of judgment against Defendants, for actual and compensatory damages, punitive damages, award attorney fees and costs, accruing interest and any further relief this Court deems equitable and just.

**PLAINTIFF REQUESTS TRIAL BY JURY.**

Respectfully submitted,

*Caleb Salmon*

_____

Caleb M. Salmon, OBA # 32272
AIZENMAN LAW GROUP
5800 E. Skelly Drive, Ste. 575
Tulsa, OK 74135
P: 918-524-9500
F: (918) 524-9555
E: caleb@aizenmanlaw.com