## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **CRIMINAL NO. 21-CR-742 (EGS)** |
| | ) | |
| v. | ) | **VIOLATION: 18 U.S.C. § 1031(a)(1)** |
| | ) | **(Major Fraud against the United States)** |
| BALFOUR BEATTY COMMUNITIES, | ) | |
| LLC | ) | |
| | ) | |
| Defendant. | ) | **FILED** |
| | ) | DEC 2 2 2021 |

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### PLEA AGREEMENT

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and the Defendant, Balfour Beatty Communities, LLC ("BBC" or "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Operating Agreement, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

### Term of the Defendant's Obligations Under the Agreement

1.      Except as otherwise provided in Paragraph 11 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as described in Paragraphs 24-26 below (the "Term"). The Defendant agrees, however, that, in the event the Fraud Section determines, in its sole discretion, that the Defendant has failed specifically to perform or

Exhibit 3 - 001

to fulfill completely its obligations under this Agreement, extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section's right to proceed as provided in Paragraphs 27-30 below. Any extension of the Term extends all terms of this Agreement, including the terms of the monitorship described in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the monitorship may be terminated early.

**The Defendant's Agreement**

2. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive any right it may have to grand jury indictment or to challenge venue in the District Court for the District of Columbia, and to plead guilty to a single count criminal Information charging the Defendant with Major Fraud against the United States, in violation of Title 18, United States Code, Section 1031(a)(1). The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Fraud Section in its investigation into the conduct described in this Agreement and other conduct related to its management of housing on, at, or near military installations operated by the United States Department of Defense.

3. The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

a. The defendant knowingly executed or attempted to execute a scheme with the intent to defraud the United States by using materially false or fraudulent pretenses, representations, or promises;

Exhibit 3 - 002

b.      The scheme took place as part of a grant, contract, subcontract, subsidy, loan, guarantee, insurance, and other form of Federal assistance as a contractor with the United States; and

c.      The value of the contract was $1 million or more.

4.      The Defendant understands and agrees that this Agreement is between the Fraud Section and the Defendant and does not bind any other component of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Fraud Section will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

5.      The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Defendant's Class A Manager in the form attached to this Agreement as Attachment B, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Class A Manager, on behalf of the Defendant.

6.      The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

7.      The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Defendant, including:

a.      the nature and seriousness of the offense, as described in the Statement of Facts attached hereto as Attachment A ("Attachment A" or "Statement of Facts"), which included

3

Exhibit 3 - 003

fraud affecting the United States Air Force, United States Army, and United States Navy, and which negatively affected military servicemembers and their families;

        b.      the pervasiveness of the offense among the Defendant's employees and at multiple military installations, and the involvement of regional management-level employees in the criminal conduct, as described in the Statement of Facts;

        c.      the Defendant did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts;

        d.      the Defendant did not conduct appropriate remedial actions in a timely manner;

        e.      the Defendant received credit for cooperation under U.S.S.G. § 8C2.5(g)(2) because it provided to the Fraud Section all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts; however, the Defendant did not qualify for additional cooperation credit under the Fraud Section's Corporate Enforcement Policy;

        f.      the Defendant had an inadequate and ineffective compliance program and internal controls during the period of the conduct described in the attached Statement of Facts; however, since the initiation of the Fraud Section's investigation, the Defendant has begun to develop enhancements to its compliance program and strengthen its internal controls, including the appointment of a Chief Compliance Officer;

        g.      the Defendant has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

Exhibit 3 - 004

h.      based on the state of the Defendant's compliance program and the progress of its remediation, including the fact that the Defendant's compliance program and internal controls have not been fully implemented or tested to demonstrate that they would prevent and detect similar misconduct in the future, the Fraud Section determined that an independent compliance monitor (the "Monitor") is necessary as set forth in Attachment D to this Agreement (Independent Compliance Monitor);

i.      the Defendant has no prior criminal history or history of civil or regulatory enforcement action;

j.      the Defendant has agreed to continue to cooperate with the Fraud Section in any ongoing investigation of the conduct of the Defendant and its subsidiaries, affiliates, officers, directors, employees, agents, business partners, consultants, and subcontractors relating to violations of Title 18, United States Code, Section 1031(a)(1) and other criminal offenses; and

k.      accordingly, after considering (a) through (j) above, the Fraud Section determined that the starting point for determining the Defendant's fine amount should be between the low end and the mid-point of the applicable U.S. Sentencing Guidelines fine range, and that the Defendant should not receive any discount off the fine amount under the Corporate Enforcement Policy.

8.      The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

a.      to plead guilty as set forth in this Agreement;

b.      to abide by all sentencing stipulations contained in this Agreement;

Exhibit 3 - 005

     c.     to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

     d.     to commit no further crimes;

     e.     to be truthful at all times with the Court;

     f.     to pay the applicable fine and special assessment;

     g.     to continue to implement a compliance and ethics program designed to prevent and detect violations of U.S. anti-fraud laws throughout its operations, including but not limited to the minimum elements set forth in Attachment C of this Agreement; and

     h.     to retain an independent compliance monitor in accordance with Attachment D of this Agreement.

9.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, from the effective date of this Agreement through the conclusion of the three-year term of probation ("Term"), the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any direct or indirect parent companies, subsidiaries, or affiliates involved in the conduct described in the attached Statement of Facts to this Agreement, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to declare a breach under this Agreement is applicable in full force to that entity.

Exhibit 3 - 006

The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Fraud Section at least 30 days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section shall notify the Defendant prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term of this Agreement the Defendant engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 28 through 30. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

10. The Defendant shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts, and other conduct under investigation by the Fraud Section or any other component of the Department of Justice at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or three years from the date this Agreement is entered. At the request of the Fraud Section, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts. The Defendant's cooperation

Exhibit 3 - 007

pursuant to this Paragraph is subject to applicable law and regulations, including data privacy and national security laws, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Fraud Section a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such an assertion. The Defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

 a. The Defendant shall timely and truthfully disclose to the Fraud Section all factual information with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, and those of its subsidiaries, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the Defendant.

 b. Upon request of the Fraud Section, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section the information and materials described in Paragraph 10(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

 c. The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents and consultants of the Defendant and any subsidiaries of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as

Exhibit 3 - 008

well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

d.    With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Defendant consents to any and all disclosures to other governmental authorities including United States authorities and those of a foreign government of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

11.    During the term of the cooperation obligations provided for in Paragraph 10 of this Agreement, should the Defendant learn of any evidence or allegation of a criminal violation of U.S. federal law, the Defendant shall promptly report such evidence or allegation to the Fraud Section. Thirty days prior to the end of the term of the cooperation obligations provided for in Paragraph 10 of this Agreement, the Defendant, by the President and Class A Manager of the Defendant, and by the President of the Defendant, will certify, in the form of executing the document attached as Attachment E to this Agreement, to the Fraud Section that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of Title 18, United States Code, Section 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

12.    The Defendant agrees that any fine or restitution imposed by the Court will be due and payable in full within thirty days of the entry of judgment following such sentencing hearing, and the Defendant will not attempt to avoid or delay payment. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the District of Columbia the

Exhibit 3 - 009

mandatory special assessment of $400 per count within ten business days from the date of sentencing.

### The United States' Agreement

13.    In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section agrees it will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures relating to (a) any of the conduct described in Attachment A, including from 2013 through 2020, or (b) information made known to the Fraud Section prior to the date of this Agreement. This Paragraph does not provide any protection against prosecution for any crimes in the future by the Defendant or by any of its officers, directors, employees, agents, or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement. This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the Defendant or its direct or indirect affiliates, subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the Information, Attachment A, or in any other matters. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

### Factual Basis

14.    The Defendant is pleading guilty because it is guilty of the charge contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment A are true and correct, that it is responsible for the acts of its

Exhibit 3 - 0010

officers, directors, employees, and agents described in the Information and Attachment A, and that the Information and Attachment A accurately reflect the Defendant's criminal conduct.

**The Defendant's Waiver of Rights, Including the Right to Appeal**

15.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section has fulfilled all of its obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

16.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance. The Defendant understands that by entering into this agreement, the Defendant surrenders certain rights as provided in this agreement. The Defendant understands that the rights of criminal defendants include the following:

a.      the right to plead not guilty and to persist in that plea;

b.      the right to a jury trial;

c.      the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

d.      the right at trial to confront and cross-examine adverse witnesses, to be

Exhibit 3 - 0011

protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

e.    pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge challenging either the conviction, or the sentence imposed in this case. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment A or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Fraud Section is free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in

Exhibit 3 - 0012

the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

## Penalty

17.    The statutory maximum sentence that the Court can impose upon the Defendant for a violation of Title 18, United States Code, Section 1031(a) is a fine of $10,000,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Sections 1031(c) and 3571(c)-(d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B). In this case, the parties agree that the gross pecuniary gain resulting from the offense is $18,700,000. Therefore, pursuant to Title 18, United States Code, Section 3571(d), the maximum fine that may be imposed is $37,400,000.

## Sentencing Recommendation

18.    The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 16.

13

Exhibit 3 - 0013

19.  The Fraud Section and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

a.  The 2018 U.S.S.G. are applicable to this matter.

b.  <u>Offense Level</u>. Based upon U.S.S.G. § 8A1.2(b)(2)(B):, the total offense level is 26, calculated as follows:

| § 2B1.1(a)(2) | Base Offense Level | 6 |
|---|---|---|
| § 2B1.1(b)(1)(K) | Amount of Loss/Gain | +20 |
| **TOTAL** | | 26 |

c.  <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a)(3), the base fine is $18,700,000 (the pecuniary gain to the Defendant from the offense)

d.  <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 7, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(2) | Organization had 1,000 or more employees and tolerance of the offense by substantial authority personnel was pervasive throughout the organization | +4 |
| (g)(2) | The organization cooperated in the investigation and affirmatively accepts responsibility for its misconduct | - 2 |
| **TOTAL** | | 7 |

<u>Calculation of Fine Range</u>:

| Base Fine | $18,700,000 |
|---|---|
| Multipliers | 1.40 (min) /2.80 (max) |
| Fine Range | $26,180,000 (min) / $52,360,000 (max) |

14

Exhibit 3 - 0014

20.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States and the Defendant agree that the following represents the appropriate disposition of the case, and agree to recommend jointly at a hearing to be scheduled at an agreed upon time that the Court impose the following sentence:

       a.     <u>Fine</u>. The Fraud Section and the Defendant agree to recommend jointly that the Court impose a sentence requiring the Defendant to pay a criminal fine of $33,660,000, payable in full within thirty days of the entry of judgment following such sentencing hearing. The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that Defendant pays pursuant to the Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in Attachment A. The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of this $33,660,000 fine. The Fraud Section believes that a disposition that includes a fine of $33,660,000 is appropriate based on the factors outlined in Paragraph 7 of the Agreement and those in Title 18, United States Code, Section 3553(a). The Fraud Section and the Defendant agree that the fine amount may be offset by $22,313,214, which is the total amount of nonrestitutionary damages and penalties that Defendant will pay pursuant to the settlement between the Defendant and the Civil Division of the Department of Justice, relating to the conduct described in the attached Statement of Facts.

       b.     <u>Mandatory Special Assessment</u>. The Defendant shall pay to the Clerk of the Court for the United States District Court for the District of Columbia within ten days of the time of sentencing the mandatory special assessment of $400 per count.

       c.     <u>Restitution</u>. The Defendant agrees to pay restitution in the amount of $31,872,209, as agreed upon by the parties, pursuant to Title 18, United States Code, Section

Exhibit 3 - 0015

3663(a)(3). The Fraud Section and the Defendant agree that this amount may be offset by $12,981,261.91, which is the total amount of restitution that Defendant will pay pursuant to the settlement between the Defendant and the Civil Division of the Department of Justice, relating to the conduct described in the Statement of Facts.

        d.    <u>Probation</u>. The Fraud Section and the Defendant agree that a term of organizational probation for a period of three years shall be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). The parties agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 8 and 10 above as well as the payments of the fine and restitution amounts set forth in Paragraph 20(a) and (c).

21.    This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

22.    Additionally, if the Court directs the preparation of a PSR, the Fraud Section will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case. At the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing hearing with adequate time for any objections to the PSR and for consideration by the Court of the PSR and the parties' sentencing submissions.

Exhibit 3 - 0016

**Independent Compliance Monitor**

23.    Promptly after the Fraud Section's selection pursuant to Paragraphs 24 below, the Defendant agrees to retain a Monitor for the term specified in Paragraph 9. The Monitor's duties and authority, and the obligations of the Defendant with respect to the Monitor and the Fraud Section, are set forth in Attachment D, which is incorporated by reference into this Agreement. Within thirty business days after the entry of judgment under this Agreement, the Defendant shall submit a written proposal to the Fraud Section identifying three monitor candidates, and, at a minimum, providing the following:

    a.    a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

    b.    a written certification by the Defendant that it will not employ or be affiliated with the Monitor for a period of not less than two years from the date of the termination of the monitorship;

    c.    a written certification by each of the candidates that he/she is not a current or recent (*i.e.*, within the prior two years) employee, agent, or representative of the Defendant, or its direct or indirect parent companies, subsidiaries, affiliates, joint ventures or related entities, and holds no interest in, and has no relationship with, the Defendant, its direct or indirect parent companies, subsidiaries, affiliates, joint ventures or related entities, or its employees, officers, or directors;

    d.    a written certification by each of the candidates that he/she has notified any clients that the candidate represents in a matter involving the Fraud Section (or any other U.S. Department of Justice component) handling the monitor selection process, and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s);

17

Exhibit 3 - 0017

and

   e. a statement identifying the monitor candidate that is the Defendant's first, second, and third choice to serve as the Monitor.

  24. The monitor candidates or their team members shall have, at a minimum, the following qualifications:

   a. demonstrated expertise with respect to federal anti-fraud laws, including experience counseling on these issues;

   b. experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including anti-fraud policies, procedures and internal controls;

   c. the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

   d. sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

  25. The Fraud Section retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by the Defendant. Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion. If the Fraud Section determines, in its sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Fraud Section, in its sole discretion, is not satisfied with the candidates proposed, the Fraud Section reserves the right to request that the Defendant nominate additional candidates. In the event the Fraud Section rejects any proposed Monitors, the Defendant shall propose additional candidates within thirty business days after receiving notice of the rejection so that three qualified candidates are proposed. This process shall continue until a Monitor acceptable to both parties is chosen. The Fraud Section and the Defendant will use their best efforts to

Exhibit 3 - 0018

complete the selection process within sixty calendar days of the execution of this Agreement. The Fraud Section retains the right to determine that the Monitor should be removed if, in the Fraud Section's sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 24 above. If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Defendant shall within twenty business days recommend a pool of three qualified Monitor candidates from which the Fraud Section will choose a replacement.

26.     The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 1. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D. The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

**<u>Breach of Agreement</u>**

27.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 10 and 11 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 8 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of Title 18, would be a violation of Title 18; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section becomes

19

Exhibit 3 - 0019

aware of such a breach after the term specified in Paragraph 1 of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the U.S. District Court for the District of Columbia or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Fraud Section's sole discretion. Any such prosecution may be premised on information provided by the Defendant. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the term described in Paragraph 1 of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the term described in Paragraph 1 of the Agreement plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 10 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the

Exhibit 3 - 0020

duration of the term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

28.     In the event the Fraud Section determines that the Defendant has breached this Agreement, the Fraud Section agrees to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Defendant.

29.     In the event that the Fraud Section determines that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section or to the Court, including the attached Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

Exhibit 3 - 0021

30. The Defendant acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements by the Defendant

31. The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Attachment A. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 27-30 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment A will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section. If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Attachment A, the Fraud Section shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment A provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment A. This Paragraph does not apply to any

22

Exhibit 3 - 0022

statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

32.    The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates, or its parent company, issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Defendant; and (b) whether the Fraud Section has any objection to the release or statement.

### Complete Agreement

33.    This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR BALFOUR BEATTY COMMUNITIES, LLC:**

Date: December 22, 2021          By: _____

Christopher Williams
President and Class A Manager
Balfour Beatty Communities, LLC

Date: December 22, 2021          By: _____

David Bitkower
David B. Robbins
Jenner & Block LLP
Outside counsel for Balfour Beatty
Communities, LLC

**FOR THE DEPARTMENT OF JUSTICE:**

23

Exhibit 3 - 0023

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*Michael P. McCarthy*

  Michael P. McCarthy
  Babasijibomi Moore
  Trial Attorneys

Exhibit 3 - 0024

## ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement ("Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and Balfour Beatty Communities, LLC ("BBC"). BBC hereby agrees and stipulates that the following information is true and accurate. BBC admits, accepts, and acknowledges that under U.S. law it is responsible for the acts of its employees and agents as set forth in this Statement of Facts, which acts BBC acknowledges were within the scope of the employees' and agents' employment and, at least in part, for the benefit of BBC. This Statement of Facts does not contain all the facts known to the Fraud Section or BBC; the Fraud Section's investigation into individuals is ongoing. Had this matter proceeded to trial, BBC acknowledges that the Fraud Section would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information attached to this Agreement:

### Relevant Entities and Individuals

1.      BBC was a diversified real estate services company headquartered in Malvern, Pennsylvania.

2.      Rick Cunefare ("Cunefare") was a citizen of the United States whose primary residence was in Phoenix, Arizona. From in or around 2013 through in or around 2015, Cunefare was employed by BBC as a Regional Property Manager, which was a regional-level supervisory role within BBC. He oversaw the military housing communities that BBC operated at Lackland Air Force Base ("AFB"), Travis AFB, Vandenberg AFB, Tinker AFB, and Fairchild AFB, which were Department of Defense installations.

A-1

Exhibit 3 - 0025

3.     Stacy Cabrera ("Cabrera") was a citizen of the United States whose primary residence was in Converse, Texas. From in or around 2013, to in or around 2016, Cabrera was employed as a Community Manager at Lackland AFB.

## **Background on Privatized Military Housing**

4.     The Military Housing Privatization Initiative ("MHPI") was a statutorily established program designed to attract private sector financing, expertise, and innovation to provide necessary housing for military servicemembers, their families, and other dependents faster and more efficiently than traditional military construction processes would allow. Put into effect via the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (110 Stat. 186, Section 2801), a goal of the MHPI was to provide military families access to safe, quality, affordable, well-maintained housing in a community where they would choose to live, while also allowing them the convenience of being near military bases and other institutions consistent with their duties.

5.     Branches of the U.S. Armed Forces, including the Air Force, Army, and Navy, which are components of the U.S. Department of Defense ("DOD"), and agencies of the United States, have used authority granted to them under the MHPI to enter into agreements with private real estate developers to develop, maintain, and operate housing for U.S. military members at military bases around the United States.

6.     Basic Allowance for Housing ("BAH") was an allowance provided to servicemembers stationed in the United States that is intended to cover housing costs in local civilian housing markets when government housing is not available. Under the MHPI, servicemembers generally used their BAH to pay rent and other fees to the private developers that

A-2

Exhibit 3 - 0026

operate housing communities in which servicemembers elected to live.

**BBC's Development and Management of Privatized Military Housing Communities**

7.      Beginning in approximately 2003, a BBC predecessor entity entered into agreements with branches of the U.S. Armed Forces to own, develop and manage military housing communities at military installations across the country. These agreements were generally valued at more than $1,000,000. BBC received payments under these agreements.

8.      Ultimately, BBC became one of the U.S. military's largest providers of privatized military housing, operating military housing communities at approximately 21 Air Force bases, 16 Army bases, and 18 Navy bases, in which tens of thousands of servicemembers and their families lived.

9.      BBC was obligated, at all times, to be truthful in its representations to the service branches and DOD, and to endeavor to provide safe and habitable housing for military servicemembers and their families.

10.     Part of the compensation that BBC received in connection with these military housing communities came in the form of fees that BBC was paid for the various phases of development and management of each housing community, from design and construction to ongoing community management and maintenance.

11.     BBC's fees for the ongoing property management and maintenance of its military housing communities generally consisted of (1) a base fee, paid to BBC monthly, and (2) performance incentive fees (the "Performance Incentive Fees"), paid to BBC quarterly or semi-annually.

12.     Performance Incentive Fees were only payable upon the approval of the relevant service branch.  To obtain the service branches' approval, BBC was required to satisfy certain

A-3

Exhibit 3 - 0027

performance objectives that were set out in the agreements that governed the military housing projects (the "Performance Objectives"). For example, the Fee Management Plan for the AMC West Air Force housing project, which consisted of military housing communities at three Air Force bases, included approximately eight Performance Objectives that, if met, entitled BBC to 100% of the quarterly Performance Incentive Fees for the AMC West project.

13.     While the details of how BBC satisfied the Performance Objectives varied from housing project to housing project, objectives themselves generally fell into four categories: (1) maintenance requests (e.g., to earn the Performance Incentive Fees, BBC had to respond to and/or complete maintenance requests within certain agreed time frames); (2) resident satisfaction (often measured by comment cards); (3) the timely completion of tasks, such as supplying documents and reports; and (4) a local commander's evaluation of BBC's performance.

14.     To track and manage maintenance requests at the housing projects that it managed, BBC used a property management software called Yardi. Generally, when residents encountered a maintenance issue in their housing units, which could include anything as minor as a ripped screen or more serious such as a major water leak, they would report the issue to an on-site management office staffed by BBC employees. Generally, a BBC Work Order Administrator would enter information about the issue into Yardi, which generated a work order that could be used to track the maintenance issue. The Work Order Administrator used Yardi to schedule the issue for repair, to be carried out by BBC Maintenance Technicians and contractors; track progress of the repair; and document its completion. When the work was completed, the Work Order Administrator would "close out" the work order.

15.     BBC also used Yardi to track its satisfaction of the maintenance work order-related Performance Objectives and then generated Quarterly Maintenance Reports from that data.

A-4

Exhibit 3 - 0028

16.     BBC collected resident satisfaction data by distributing comment cards to residents, often in connection with maintenance at residents' homes. BBC employees then collected the cards. This data was significant, because it helped ensure that servicemembers and their families lived in clean, comfortable, and safe housing while engaged in their duties on behalf of the military.

17.     To obtain Performance Incentive Fees, BBC was required to submit to the service branches documentation and a statement that it had satisfied the Performance Objectives, including the objectives related to maintenance and customer satisfaction described above. These submissions were material to the decision-making of the service branches, which relied on BBC's submissions in deciding whether to approve the payment of relevant Performance Incentive Fees.

18.     BBC's submissions generally consisted of a report prepared using data from Yardi and other sources (e.g., comment card metrics) and a written letter, that BBC employees submitted to the service branches quarterly or semi-annually. Figure 1, below, is an example of an excerpt from a Performance Incentive Fee request letter that was submitted to the Air Force for the AMC West housing project for the fourth quarter of 2014.

RE: AMC West Q4 2014 Incentive Management Fee Request

Attached is our AMC West Q4 2014 incentive fee submittal with supporting documents.

**Summary of Incentive Fees are as follows:**

**Community and Maintenance Management Incentive Fee**
Recommended for Approval: $358,624.00

**Performance for the Development Incentive Fee**
Recommended for Approval: $15,089.99

**Performance for the Renovation Incentive Fee**
Recommended for Approval: $10,204.00

**Total Request:** $383,917.99

*Figure 1*

19.     All three service branches to which BBC submitted requests for Performance

A-5

Exhibit 3 - 0029

Incentive Fees were limited in their ability to independently verify the accuracy of BBC's data, and thus these service branches relied on the accuracy of the data that BBC submitted in evaluating whether BBC had met the Performance Objectives.

20.    Upon the service branches' approval of BBC's Performance Incentive Fee request letters and data, BBC would generally be authorized to receive distributions from an account in which Performance Incentive Fee funds were set aside.

## Overview of BBC's Scheme to Defraud the U.S. Military

21.    From in or around 2013 to in or around 2019, in many quarters in which BBC did not legitimately meet certain Performance Objectives, primarily those related to maintenance and customer satisfaction, at various military housing projects, BBC employees, including Cunefare, Cabrera, and others, falsified information so that BBC's Performance Incentive Fee requests falsely reflected that BBC had met those objectives. Specifically, BBC employees altered or manipulated data in Yardi and destroyed or falsified resident comment cards to falsely inflate these metrics and, ultimately, to fraudulently induce the service branches to pay Performance Incentive Fees which BBC had not earned and to which BBC was not entitled.

22.    These false submissions were material, in that they influenced and were capable of influencing the decisions of the service branches.

23.    In devising and executing this scheme to defraud, Cunefare, Cabrera, and others acted in the scope of their agency and employment at BBC and acted at least in part to benefit BBC.

## The Effects of BBC's Scheme on Servicemembers and Their Families

24.    BBC employees, acting to benefit BBC, made false representations to all three service branches that maintenance issues raised by residents were being addressed in a timely

A-6

Exhibit 3 - 0030

manner, when in fact many were not.

25.     For example, on multiple occasions, BBC opened work orders in response to resident complaints about acute (*e.g.*, leaks) and long-term (*e.g.*, warped floors) maintenance issues, and then closed the work orders prior to completing the required work. On such occasions, BBC falsely represented to the service branches that the work had been completed in a sufficiently timely manner to qualify for Performance Incentive Fees.

26.     BBC's closing of work orders before the work was completed resulted in some instances in unnecessary delays in the resolution of maintenance issues to the detriment of residents.

27.     As a result of BBC's false representations, the service branches had an inaccurate view of the state of BBC's military housing projects. As a result, the service branches' ability to timely assess and correct BBC's true performance was negatively impacted.

### Specific Actions by BBC Employees to Supply the Air Force with False Information

28.     The following specific actions by BBC employees had the effect of supplying false information to the Air Force, were in furtherance of the scheme to defraud, and were carried out by employees and agents of BBC acting within the scope of their employment or agency, and for the benefit of BBC.

*Actions by Cunefare*

29.     Cunefare gave instructions to Cabrera and others, who were agents and employees of BBC, to manipulate and falsify work order data in Yardi in multiple quarters so that BBC's requests for Performance Incentive Fees would reflect that BBC had met Performance Objectives, when in truth and in fact, it had not. This allowed BBC to obtain Performance Incentive Fees to which it was not entitled, and to reap the pecuniary benefits of the scheme.

A-7

Exhibit 3 - 0031

30.    Specifically, Cunefare directly supervised military housing community managers, including Cabrera, who were responsible for overseeing the day-to-day management of several of BBC's military housing communities.

31.    In addition to other oversight duties, Cunefare was responsible for reviewing and approving Quarterly Maintenance Reports prepared by the community managers and their subordinates and ensuring that the numbers in the Quarterly Maintenance Reports were submitted to the Air Force with the Performance Incentive Fee request letters.

32.    Cunefare knew that the Quarterly Maintenance Reports he approved were used to report maintenance-related Performance Objectives to the Air Force, and to obtain the Air Force's authorization for the Performance Incentive Fee each quarter. Cunefare further understood that meeting Performance Objectives and achieving Performance Incentive Fees were important goals for BBC, because meeting these goals would allow BBC to obtain more money from the Air Force.

33.    In quarters in which BBC did not legitimately meet the maintenance-related Performance Objectives, Cunefare gave instructions to community managers and others that resulted in the community managers and others manipulating and falsifying information in Yardi so that the Quarterly Maintenance Report would falsely reflect that BBC had met the objectives. These actions had the effect of falsely inflating BBC's Performance Objectives.

34.    As a result of Cunefare's actions, BBC employees manipulated and falsified information in Yardi in quarters to ensure that they met their Performance Objectives, and BBC obtained the Performance Incentive Fee.

35.    By directing information to be manipulated in Yardi, Cunefare and other BBC employees knowingly and intentionally caused false information regarding the Performance Objectives to be supplied to the Air Force on a quarterly basis, deceiving the Air Force into

A-8

Exhibit 3 - 0032

believing that BBC was meeting the Performance Objectives required to obtain Performance Incentive Fees, and enriching BBC at the expense of the Air Force, when in fact BBC was unable to keep up with maintenance issues at many of the military housing communities that it managed.

*Actions by Cabrera*

36.     As the Community Manager for Lackland AFB, Cabrera was the senior on-site BBC employee responsible for overseeing the day-to-day management of the privatized military housing community there. Approximately 20 BBC staff members reported to Cabrera.

37.     Cabrera knew that her Quarterly Maintenance Report was used to report the Performance Objectives to the Air Force, and to obtain the Air Force's authorization for the Performance Incentive Fee for Lackland AFB each quarter.

38.     Cabrera worked with Cunefare and others to manipulate and falsify information in Yardi in multiple quarters so that Quarterly Maintenance Reports would falsely reflect that BBC had met Performance Objectives, when in truth and in fact, as Cabrera and other BBC employees well knew, it had not. This allowed BBC, acting through these employees, to submit materially false and fraudulent requests to the Air Force for payment of Performance Incentive Fees to which it was not entitled.

39.     Specifically, in quarters in which BBC did not meet the Performance Objectives, Cabrera manipulated and falsified information in Yardi so that the Quarterly Maintenance Report for Lackland AFB would falsely reflect that BBC had met the objectives.

40.     Cabrera admitted that she knowingly and intentionally directed her subordinates to manipulate information in Yardi by, among other things, adjusting completion times for work orders, "closing" work orders early, or marking work orders "complete" prior to maintenance work

A-9

Exhibit 3 - 0033

actually being performed. These actions had the effect of falsely inflating BBC's Performance Objectives at Lackland AFB.

41.     On various occasions, Cabrera personally manipulated and falsified information in Yardi to create false Quarterly Maintenance Reports which were submitted to the Air Force.

42.     By manipulating information in Yardi, and directing information to be manipulated, Cabrera and other BBC employees knowingly and intentionally caused false information regarding the Performance Objectives to be supplied to the Air Force on a quarterly basis, deceiving the Air Force into believing that BBC had met the Performance Objectives necessary to receive Performance Incentive Fees related to work order performance.

### BBC's Inadequate Controls Contributed to the Misconduct

43.     In addition to the specific criminal actions admitted to above, widespread failures at the regional and BBC corporate and executive levels contributed to its provision of false information to the service branches.

44.     Specifically, a regional vice president pressured subordinates to meet metrics without regard to accuracy and to ensure that Quarterly Maintenance Report metrics were above thresholds necessary to obtain Performance Incentive Fees.

45.     In addition, a regional vice president, and at least two regional property managers (in addition to Cunefare) issued directives to subordinates to meet Performance Objectives and benchmarks in terms that subordinates reasonably interpreted as encouraging improper behavior.

46.     In addition to actively promoting the falsification of data, regional personnel were aware of data discrepancy and data falsification allegations and failed to take corrective action.

47.     BBC corporate-level employees, including at least one senior vice president, prioritized the payment of Performance Incentive Fees over addressing concerns about the

Exhibit 3 - 0034

accuracy of Yardi data.

48.     Individuals at the executive level, including BBC's former Chief Operating Officer, contributed to pressure to qualify for and collect Performance Incentive Fees, and were aware of warning signs of Performance Incentive Fee-related misconduct, including concerns raised by the service branches, but failed to take immediate action to investigate the allegations and correct any misconduct. In at least one instance, an executive vice president downplayed Air Force concerns, including about Yardi data accuracy and the falsification of comment cards.

49.     These actions and failures to act had the effect of permitting lower-level BBC employees to execute the scheme to defraud, but also allowing it to continue despite warning signs as early as 2016.

50.     BBC, acting through its employees and agents, acted knowingly and with the intent to defraud the service branches in connection with military housing contracts.

### Quantification of Losses to the Service Branches

51.     From in or around 2013 to in or around 2020, the Air Force, Army, and Navy collectively sustained a loss of approximately $18,700,000 as a result of BBC's scheme to defraud. BBC accepts that this figure is the proper measure of loss for the purposes of calculating the appropriate fine under the U.S. Sentencing Guidelines.

_(signature)_

_Balfour Beatty Communities, LLC_
_President and Class A Manager_

A-11

Exhibit 3 - 0035

## ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Balfour Beatty Communities, LLC (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to the Fraud Section's investigation of violations of Title 18, United States Code, Section 1031(a)(1), Major Fraud against the United States by the Company;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into the Plea Agreement with the Fraud Section (the "Agreement");

WHEREAS, the Company's General Counsel and External Counsel advised the President and Class A Manager of the Company, Christopher Williams, of the Company's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section;

Therefore, the President and Class A Manager of the Company has RESOLVED that:

1.  The Company (a) acknowledges the filing of the one-count Information charging the Company with a felony violation of Major Fraud against the United States in violation of Title 18, United States Code, Section 1031(a)(1); (b) waives indictment on such charge and enters into the Agreement with the Fraud Section; and (c) agrees to pay a Total Criminal Monetary Amount of $65,532,209 under the Agreement with respect to the conduct described in the Information;

2.  The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the

Exhibit 3 - 0036

Agreement and any charges by the United States arising out of the conduct described in Attachment A to the Agreement of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the District of Columbia; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in Attachment A to the Agreement and in the Information or relating to conduct known to the Fraud Section prior to the date on which the Agreement is signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3.     The President and Class A Manager of the Company is hereby authorized, empowered, and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by the Company's General Counsel and External Counsel at this meeting with such changes as the President and Class A Manager of the Company may approve;

4.     The President and Class A Manager of the Company is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions;

5.     All of the actions of the President and Class A Manager of the Company, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company; and

6.     The President and Class A Manager of the Company further authorizes, empowers, and directs the General Counsel of the Company, Leslie Cohn, to appear in the United States District Court for the District of Columbia on behalf of the Company as its

Exhibit 3 - 0037

corporate representative to take such actions as may be necessary or appropriate to enter the plea of guilty and in connection with sentencing.

Date: _December 22, 2021_    By: _____

Christopher Williams
President and Class A Manager
Balfour Beatty Communities, LLC

B-3

Exhibit 3 - 0038

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with U.S. anti-fraud laws, Balfour Beatty Communities, LLC ("BBC" or the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures, in order to ensure that the Company maintains an effective compliance program that is designed to effectively detect and deter violations of U.S. anti-fraud law. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, code of conduct, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of U.S. anti-fraud laws and its code of conduct and demonstrate rigorous adherence by example. The Company will also ensure that middle management, in turn, reinforces those standards and encourages employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations.

Exhibit 3 - 0039

*Policies and Procedures*

2.     The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of U.S. anti-fraud laws, which policy shall be memorialized in a written code of conduct.

3.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. anti-fraud laws and the Company's code of conduct, and the Company will take appropriate measures to encourage and support the observance of the code of conduct and related ethics and compliance policies and procedures against violation of U.S. anti-fraud laws by personnel at all levels of the Company.  These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company.  The Company shall notify all employees that compliance with the code of conduct and related ethics and compliance policies and procedures is the duty of individuals at all levels of the Company.

4.     The Company will ensure that its privatized military housing portfolio maintains an effective system of internal controls designed to ensure the making and keeping of fair and accurate reports and records of the Company's facilities management operations, corresponding claims for and payments of fees relating to that work, and policies and procedures designed to effectively detect and deter violations of U.S. anti-fraud law. The system should be designed to provide reasonable assurances that facilities management activities are recorded as necessary to permit accurate and transparent billing in conformity with applicable contracts and legal standards.

*Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

Exhibit 3 - 0040

6.    The Company shall review these policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

*Proper Oversight and Independence*

7.    The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's code of conduct and related ethics policies and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, or the Company's sole member, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.    The Company will implement mechanisms designed to ensure that its code of conduct and related ethics policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents, outside parties, and/or business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents, outside parties, and/or business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, outside parties, and/or business partners, certifying compliance with the training requirements. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

C-3

Exhibit 3 - 0041

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents, outside parties, and/or business partners, on complying with the Company's code of conduct and related ethics policies, and procedures, including when they need advice on an urgent basis.

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents, outside parties, and/or business partners, concerning violations of U.S. anti-fraud laws or the Company's code of conduct and related ethics policies and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of U.S. anti-fraud laws or the Company's code of conduct and related ethics policies and procedures. The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

12.     The Company will implement mechanisms designed to effectively enforce its code of conduct and related ethics policies and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of U.S. anti-fraud laws and the Company's code of conduct and related

C-4

Exhibit 3 - 0042

ethics policies and procedures, by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, (a) reasonable steps are taken to remedy the harm resulting from such misconduct; (b) appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, code of conduct, and related ethics policies and procedures; and (c) necessary modifications are made to ensure the overall compliance program is effective.

*Mergers and Acquisitions*

16.    The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding U.S. anti-fraud laws by legal, accounting, and compliance personnel.

17.    The Company will ensure that the Company's code of conduct and related ethics policies and procedures regarding U.S. anti-fraud laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company, and that the Company will promptly (a) train the directors, officers, employees, agents, and business partners consistent with Paragraphs 8-9 above on the Company's code of conduct and related ethics policies, and procedures; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with U.S. anti-fraud laws.

*Monitoring and Testing*

18.    The Company will conduct periodic reviews and testing of its code of conduct and related ethics policies and procedures designed to evaluate and improve their effectiveness in

Exhibit 3 - 0043

preventing and detecting violations of U.S. anti-fraud laws, as well as of the Company's code of conduct and related ethics policies and procedures, taking into account relevant developments in the field and evolving international and industry standards. The Company will ensure that compliance and internal control personnel have sufficient direct and indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing. Based on such review and testing and its analysis of any prior misconduct, the Company will conduct a thoughtful root cause analysis of such misconduct and timely and appropriately remediate to address such root causes.

Balfour Beatty Communities, LLC
President and Class A Manager

C-6

Exhibit 3 - 0044

**ATTACHMENT D**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Balfour Beatty Communities, LLC (the "Defendant"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), are as described below:

1.      The Defendant will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the extension or early termination provision of Paragraph 1 of the plea agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Defendant's compliance with the terms of the Agreement, including the corporate compliance program in Attachment C, to specifically address and reduce the risk of any recurrence of the Defendant's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal controls, record-keeping, and financial reporting policies and procedures of the Defendant as they relate to the Defendant's current and ongoing compliance with U.S. anti-fraud laws and applicable Department of Defense regulations and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  The Mandate shall also include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program as described in Attachment C of the Agreement.

Exhibit 3 - 0045

*Defendant's Obligations*

3.    The Defendant shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Defendant's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations. To that end, the Defendant shall: facilitate the Monitor's access to the Defendant's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Defendant shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Defendant shall use its best efforts to provide the Monitor with access to the Defendant's former employees and its third-party vendors, agents, and consultants.

4.    Any disclosure by the Defendant to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Defendant of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section, pursuant to the Agreement.

*Withholding Access*

5.    The parties agree that no attorney-client relationship shall be formed between the Defendant and the Monitor. In the event that the Defendant seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Defendant that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Defendant reasonably believes production would otherwise be

D-2

Exhibit 3 - 0046

inconsistent with applicable law, the Defendant shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6. If the matter cannot be resolved, at the request of the Monitor, the Defendant shall promptly provide written notice to the Monitor and the Fraud Section. Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access. The Fraud Section may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Defendant and Review Methodology*

7. In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Defendant's personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Defendant's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Defendant, as well as the Defendant's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Defendant-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8. The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) organizational structure; (b) training programs or lack thereof; (c) compensation structure; (d) internal auditing processes; (e) internal investigation procedures; (f) reporting mechanisms; (g) corporate culture; and (h) employee incentives and disincentives.

D-3

Exhibit 3 - 0047

9.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Defendant's current policies and procedures governing compliance with U.S. anti-fraud laws and applicable Department of Defense regulations; (b) on-site observation of selected systems and procedures of the Defendant at sample sites, including internal controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Defendant's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below. With respect to the first report, after consultation with the Defendant and the Fraud Section, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Defendant and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Defendant and the Fraud Section, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Defendant and the Fraud Section shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Defendant and the Monitor with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

D-4

Exhibit 3 - 0048

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Defendant. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.     The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Defendant, the Monitor, and the Fraud Section). The Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Defendant's program for ensuring compliance with U.S. anti-fraud laws and applicable Department of Defense regulations. The Monitor should consult with the Defendant concerning his or her findings and recommendations on an ongoing basis and should consider the Defendant's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Defendant prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Defendant's history or compliance policies, procedures and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise

Exhibit 3 - 0049

concludes merit particular attention. The Monitor shall provide the report to the governing body and contemporaneously transmit copies to:

> Avi Perry
> Acting Chief, Market Integrity and Major Frauds Unit
> Andrew Gentin
> Acting Chief, Corporate Enforcement, Compliance, and Policy Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005

After consultation with the Defendant, the Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Fraud Section.

13. Within one hundred fifty (150) calendar days after receiving the Monitor's first report, the Defendant shall adopt and implement all recommendations in the report. If the Defendant considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the Fraud Section of any such recommendations in writing within sixty (60) calendar days of receiving the report. The Defendant need not adopt those recommendations within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Defendant and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Defendant serves the written notice.

14. In the event the Defendant and the Monitor are unable to agree on an acceptable alternative proposal, the Defendant shall promptly consult with the Fraud Section. The Fraud Section may consider the Monitor's recommendation and the Defendant's reasons for not adopting

Exhibit 3 - 0050

the recommendation in determining whether the Defendant has fully complied with its obligations under the Agreement. Pending such determination, the Defendant shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

*Follow-Up Reviews*

16.     A follow-up review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Defendant, the Monitor and the Fraud Section). The Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review. After consultation with the Defendant, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Fraud Section.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's second report, the Defendant shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Defendant notifies in writing the Monitor and the Fraud Section concerning any recommendations that the Defendant considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Defendant need not adopt that recommendation within the one hundred twenty (120) calendar days of

Exhibit 3 - 0051

receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Defendant and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Defendant serves the written notice.

18.    In the event the Defendant and the Monitor are unable to agree on an acceptable alternative proposal, the Defendant shall promptly consult with the Fraud Section. The Fraud Section may consider the Monitor's recommendation and the Defendant's reasons for not adopting the recommendation in determining whether the Defendant has fully complied with its obligations under the Agreement. Pending such determination, the Defendant shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

19.    The Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report. The Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18. Following the third review, the Monitor shall certify whether the Defendant's compliance program, including its policies, procedures, and internal controls, is reasonably designed and implemented to prevent and detect violations of U.S. anti-fraud laws and applicable Department of Defense regulations. The final review and report shall be completed and delivered to the Fraud Section no later than thirty (30) days before the end of the Term.

D-8

Exhibit 3 - 0052

*Monitor's Discovery of Potential or Actual Misconduct*

20.     (a)     Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the Defendant or any entity or person working, directly or indirectly, for or on behalf of the Defendant; or

- the Defendant may have maintained false books, records or accounts; or

- the Defendant may have failed to implement a system of internal accounting controls that is sufficient to accurately record the Defendant's transactions (collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Defendant's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Fraud Section at any time, and shall report Potential Misconduct to the Fraud Section when it requests the information.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and not to the Defendant. The presence of certain factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and not to the Defendant, namely, where the Potential Misconduct involves senior management of the Defendant or involves obstruction of justice.

D-9

Exhibit 3 - 0053

(c)     If the Monitor believes that any Potential Misconduct has occurred or may constitute a U.S. criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Defendant should occur as the Fraud Section and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Defendant's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section or not. Further, if the Defendant or any entity or person working directly or indirectly for or on behalf of the Defendant withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and address the Defendant's failure to disclose the necessary information in his or her reports.

(e)     Neither the Defendant nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Fraud Section within thirty (30) calendar days after providing each report to the Fraud Section to discuss the report, to be followed by a meeting between the Fraud Section, the Monitor, and the Defendant.

22.     At least annually, and more frequently if appropriate, representatives from the Defendant and the Fraud Section will meet to discuss the monitorship and any suggestions,

Exhibit 3 - 0054

comments, or improvements the Defendant may wish to discuss with or propose to the Fraud Section, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

Balfour Beatty Communities, LLC
President and Class A Manager

D-11

Exhibit 3 - 0055

**ATTACHMENT E**

**CERTIFICATION**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention: Chief of the Fraud Section


Re:      Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 11 of the Plea Agreement ("the Agreement") filed on December 22, 2021 in the United States District Court for the District of Columbia, by and between the United States of America and Balfour Beatty Communities, LLC (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 10 of the Agreement, and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") any and all evidence or allegations of conduct required pursuant to Paragraph 10 of the Agreement, which includes evidence or allegations of any violation of the U.S. fraud laws committed by the Company's employees and agents upon any domestic government agency ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 10 and the representations contained in this certification constitute a significant and important component of the Agreement and of the Fraud Section's determination whether the Company has satisfied its obligations under the Agreement.

E-1

Exhibit 3 - 0056

The undersigned hereby certify that they are the President and Class A Manager of the Company, and the President of the Company, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of Columbia. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of Columbia.

Date: _____          Name (Printed): Christopher Williams


                                        Name (Signed): _____
                                        President and Class A Manager
                                        Balfour Beatty Communities, LLC

Date: _____          Name (Printed): Richard Taylor


                                        Name (Signed): _____
                                        President
                                        Balfour Beatty Communities, LLC

Exhibit 3 - 0057